[Civ. No. 475.   Third Appellate District.—December 7, 1908.]

BARRETT-HICKS COMPANY, Appellant, v. FRANK GLAS, JR., WM. H. GLAS, COMMERCIAL BANK OF MADERA et al., Respondents.

MECHANICS' LIENS—MATERIALS FURNISHED TO CONTRACTOR FOR OWNERS—GUARANTOR—FINDING OF UNTRUE STATEMENT AGAINST EVIDENCE.—Where the evidence clearly shows that the plaintiff's notice of lien for materials furnished correctly stated that the materials were furnished to the contractor as agent for the owners, at their request, the contract being void for want of proper record, and such notice corresponded with the complaint, *held,* that a finding that the notice of lien untruly stated the fact, and that the materials were furnished to one who had guaranteed the debt for the owners, as having charge of the funds, was against the evidence.

ID.—CHARGE ON PLAINTIFF'S BOOKS TO GUARANTOR—RELATION OF GUARANTOR NOT CHANGED.—The fact that the plaintiff made a charge on its books against the guarantor who had agreed to guarantee the payment of the debt did not change his contractual relation to the plaintiff as a mere guarantor of the principal obligation of the owners to the plaintiff. The obligation of a guarantor only arises when there is a principal debtor.

ID.—GUARANTY NOT AFFECTING LIEN.—There is nothing in the statute which would release the owner and the building from the operations of the lien, to which the person supplying the materials is entitled, by reason of the fact that a third person has assumed the relation of guarantor of the debt. The creditor cannot be presumed to have waived his lien by taking this additional security.

ID.—LIEN OF SURETY ON BOND OF CONTRACTOR—DISCHARGE OF OBLIGATION—LABOR AND MATERIALS AUTHORIZED BY OWNER.—Although a surety on the bond of the contractor can enforce no lien while the

obligation subsists, especially if liens are claimed in excess of the bond, yet, when he has been discharged as surety, by material changes in the plans of the building to which the bond relates, to which he has not consented, he may enforce a lien for labor done and materials furnished for the building by the express authority of the owner.

ID.—CONSTRUCTION OF BOND.—Where the bond was attached to a building contract to complete one story, and provided for alterations therein, it must be construed as referring exclusively to alterations in the plans for the single story, and not as covering alterations by the erection of an additional story without the express consent of the surety.

APPEAL from a judgment of the Superior Court of Madera County.   W. M. Conley, Judge.

The facts are stated in the opinion of the court.   Further facts are stated in the previous decisions therein referred to.

L. L. Cory, for Appellant.

W. H. Larew, for Respondent Glas.

R. L. Hargrove, and F. A. Fee, for Other Respondents.

CHIPMAN, P. J.—Foreclosure of mechanics' and materialmen's liens.   The detailed facts will be found stated in the consolidated action under this title in 97 Pac. 423 and 99 Pac. 857.   Certain of the causes of action were first disposed of in this court which were later taken to the supreme court by transfer, where the conclusions of this court were concurred in.   The present appeal, which is on a separate transcript, was taken by plaintiff: First, from that part of the judgment entered in the first cause of action set out in the complaint, adjudging that plaintiffs are not entitled to the lien claimed, to wit, for certain building materials furnished defendants Glas through their agent, Sircy, amounting in value to $89.10, with interest thereon at seven per cent per annum, from May 11, 1904; and, second, from that part of the judgment, to like effect, entered in the second cause of action, to wit, for certain work and materials furnished by one Madary, amounting to the sum of $387.24, with interest at seven per cent from May 11, 1904, which said claim and lien were duly assigned to plaintiffs.

1. As to the first of these causes of action the nineteenth finding of the court is as follows: "The court finds that said building materials furnished by plaintiff, Barrett, Hicks Co., were not furnished at the special instance and request of said defendants, Frank Glas Jr. and W. H. Glas, through their said agent, W. J. Sircy, but that said materials aforesaid were furnished at the special instance and request of M. R. Madary, and were charged on the books of said plaintiff corporation to the account of said M. R. Madary, and the allegation in plaintiff's complaint in that regard is untrue, as is likewise the statement in its said notice and claim of lien, that said materials were furnished to W. J. Sircy, the contractor; that plaintiff paid out and expended for the filing and recording of said notice of lien the sum of $1.50."

The allegation of the complaint, so found to be untrue, was as follows: "And that during the erection and construction of said building said Barrett, Hicks & Company, a corporation, at the special instance and request of said defendants, Frank Glas Jr. and Wm. H. Glas, through their agent, W. J. Sircy, did furnish certain building materials to be used and which were actually used in the erection and construction of said brick building."

The contention of appellant is that the evidence, without conflict, shows that the allegation is true, and therefore the finding is unsupported and should have been the other way. There is not much evidence upon this claim, and we quote it in its entirety. It will be borne in mind that Sircy was the contractor, and as such is spoken of as the agent of the Glas brothers. Sircy testified as follows:

"When I went to Barrett-Hicks Company to get the material, Mr. Madary did not go along with me. When I bought these goods from Barrett-Hicks Company I did not know who they were charged to, I never saw the books. They were sold to me; I went in and made arrangements with Charley Barrett myself. Barrett-Hicks Company didn't say anything about Mr. Madary when I had my conversation with them. I told Charley Barrett when I bought the stuff that this money comes from Mr. Madary, that that was where they were to get their money from. The goods were sold to me and shipped to me here, but I don't know how the charge was made upon the books. They knew Madary was getting all the

money and that they were to be paid through Mr. Madary.
Barrett-Hicks Company told me what they would deliver the
goods on the car for, and the price was mentioned, that is,
I told them about how many squares there would be, and it
cost so much per square. Before getting the material from
Barrett-Hicks Company I had a talk with Mr. Madary about
it. I think I told Mr. Madary I could get it cheaper from
them than anywhere else.''

''Mr. Cory (Attorney for Plaintiff): If there is anything
important in that I am perfectly willing to state that at the
time he went to Barrett-Hicks to furnish this material, they
talked with Mr. Madary about it, and he told them that that
was all right, that he would see that their claim was paid.
There is no question about that fact at all.''

Madary testified as follows: ''. . . All I know about guar-
anteeing Barrett-Hicks & Co.'s bill is that Mr. Barrett called
me by 'phone and said Mr. Sircy had come there and ordered
some iron for the Glas Brothers' building of Madera, and
that he told them I was handling the money for the job, and
Mr. Barrett wanted to know if that was so, and I told him
that it was, and I asked him how much the bill was and he
told me it was $87.00 and I told him it would be all right,
I would guarantee the bill, I was handling the money and I
would guarantee it. I never thought of such a thing as pur-
chasing the material, I had no use for it.''

There was also introduced in evidence, without objection,
a statement from the books of Barrett-Hicks Company show-
ing that the account for the material so furnished was charged
to M. R. Madary, upon the books of that company.

It is uncontradicted that Sircy purchased the materials
from plaintiff, and that he ordered them delivered to him at
the building; and that they were so delivered and used in its
construction. It is also uncontradicted that Madary was told
''over the 'phone'' by plaintiff that Sircy had ''ordered some
iron for the Glas Brothers building and that he told them''
(Barrett-Hicks Company) that he, Madary, ''was handling
the money for the job''; that they ''wanted to know if that
was so'' and were told it was, and after being told the amount
of the purchase, Madary said ''it was all right''; that he
''would guarantee the bill''; that he ''was handling the
money and would guarantee it'' (the bill). All the parties

knew that the material was for the building being erected by Sircy, as contractor, and Madary testified that he had "no use for it" and "never thought of such a thing as purchasing the material."

It appeared that plaintiff charged the bill to Madary on its books, but it had no authority to do so otherwise than as guarantor, and his obligation to plaintiff was that of guarantor. Plaintiff could not change Madary's contractual relation to it without his consent by an entry on its books. That Madary's relation to plaintiff was that of guarantor conclusively appears from his testimony. He distinctly stated that he would guarantee the payment of the bill, and the obligation of guarantor arises only where there is a principal debtor. (*Kilbride* v. *Moss*, 113 Cal. 432, [54 Am. St. Rep. 361, 45 Pac. 812].) The evidence, without conflict, is that the materials were furnished by plaintiff at the special instance and request of Sircy for the express purpose, as found by the court, of being used in the construction of the building and were so used. Section 1183 of the Code of Civil Procedure gives any person furnishing materials so to be used and which were so used, a lien therefor, for their value, and where the contract for the erection of the building is void, as was the case here, for noncompliance with the provisions of the statute, the materials so furnished shall be deemed to have been furnished at the instance and request of the owner. The materials were furnished to Sircy and the notice of lien correctly so stated. There is nothing in the statute which would release the owner and the building from the operation of the lien, to which the person supplying the materials is entitled, by reason of the fact that a third person has assumed the relation of guarantor of the debt. The creditor cannot be presumed to have waived his lien by having this additional security. But it seems to us not material what Madary's liability to plaintiff is, as he was not the principal debtor to whom the materials were furnished, and by whom they were to be used, and were used, in the construction of the building. The learned trial judge could not have denied the lien upon the ground that the materials were not furnished to be used or were not used in the construction of the building, for he found that they were so furnished and used. The theory must have been that they were furnished at the special in-

stance and request of Madary. In this, we think, the court erred and that the finding is not supported by the evidence.

2. The defense against Madary's lien for labor and material furnished by him was that he was one of the sureties on the bond given by the contractor to indemnify the owner. The bond provided that the sureties would answer as such for the full performance by Sircy of all the terms and conditions of the contract to be by him performed, "and jointly and severally guarantee . . . the delivery of said building free from all liens that may be filed against the said contractor in the above contract, not exceeding the sum of two thousand dollars." The eleventh finding of the court is as follows:

"The court finds that on the 17th day of November, 1903, M. R. Madary and C. J. Craycroft, of Fresno, California, became sureties on the bond of said contractor, W. J. Sircy, upon the said contract of November 9th, 1903, in and by which bond said sureties guaranteed the performance of said contract of said date, and the delivery of said building free from all liens that may be filed against the same. . . ."

It was held in the appeals heretofore decided, on the authority of the cases there cited, that where such a bond has been given the surety cannot claim and enforce a lien for labor or materials furnished for a building of which the completion according to contract and delivery free from liens has been guaranteed by such surety. To avoid the force of these decisions appellant contends: First, that the pleadings of defendant and the findings of the court are not sufficient, in themselves, to justify the conclusion that the assignee of Madary may not foreclose the latter's lien; and, second, that the evidence in the case shows that Madary was entitled to a lien against the building, and that if he ever had been a surety, he was released from all liability upon the bond.

Upon the first of these points appellant relies on *Blyth* v. *Torre* (Cal.), 38 Pac. 639. A rehearing was granted in that case and we have been unable to find it reported subsequently. In the course of the opinion it was said: "The case appears to have been considered as though the presentation of the bond in open court at the trial *ipso facto* estopped plaintiff from taking any other step in the prosecution of his action, and this, too, regardless of the amount of the bond, as compared either to the amount of plaintiff's claim or the amount of defendant's damage." Apparently in that case there was no answer to plaintiff's complaint setting up the fact as to

the giving of a bond by plaintiff. It appeared in the present case that the giving of the indemnity bond was set forth in the answer of defendants. The proof of its execution and all the facts relating to the furnishing of materials went in without objection, and it appeared that the liens sued upon were in excess of the amount of the bond. We think the point now under consideration is not well taken.

Appellant grounds his second point upon changes and alterations which were made in the contract, thus, it is claimed, exonerating the surety. It is hence argued that, being discharged from liability on the bond, his right to a lien stood as though there was no bond. Appellant's conclusion, we think, is sound if his premise is not faulty.

It is well-settled law that a surety may stand upon the strict letter of his bond, and that where the principal has, without the consent of the surety, materially violated the terms of the agreement for the performance of which the surety stands sponsor, the latter is exonerated from all liability upon his bond. This principle has been many times applied where the surety has guaranteed the faithful performance of building contracts. For example, where payments to the contractor have been prematurely made (*Glenn* v. *Jones et al.*, 146 Cal. 518, [80 Pac. 695]) ; where the owner failed to retain in his hands twenty-five per cent of the contract price as stipulated (*Bragg* v. *Shain*, 49 Cal. 131; *Burnett* v. *Glas*, 154 Cal. 249, [97 Pac. 423]) ; where the owner has retained in his hands sufficient money to pay all liens (*Kiessig* v. *Allspaugh*, 91 Cal. 231, [27 Pac. 655] ; *Barnett et al.* v. *Barrett-Hicks Co.*, 5 Cal. App. 321).; where there have been substantial deviations in the plans for the construction of the building. (*Judah* v. *Zimmerman*, 22 Ind. 388; *United States* v. *Corwine*, 1 Bond, 339, Fed. Cas. No. 14,871; Civ. Code, sec. 2819; *Burnett* v. *Glas*, 154 Cal. 249, [97 Pac. 423].)

The facts in this present case bring it clearly within the rule. There were not only several material departures from the plans in some of the parts of the original building, but there was an additional story added to it, making a two-story building, while a one-story building was originally contracted to be built. We entertain not the slightest doubt but that these changes and alterations in the building completely exonerated Madary as surety unless it was shown that he consented thereto, either by the terms of his bond or otherwise.

It was said in *Tuohy* v. *Woods,* 122 Cal. 665, [55 Pac. 683]: "When a surety has shown that the contract to which he became a surety has been changed, he has then shown that there has been an attempt to make him liable on a new and different contract; and the burden is then upon the other party to show that the surety has consented to the new contract."

Concerning these changes Sircy testified: "In order to make these alterations and additions I had no conferencè with the architect at all, he wasn't there. I and the Glas boys would make a trade, and we would have a little written agreement between ourselves and signed by ourselves, that is one part of it, part of the work they had little extra things, and part of it was signed, and part wasn't signed by us. In some cases I would say it was before the work was done, and in others I would be going along with the work." The original contract was dated November 9, 1903. On December 24, 1903, a written agreement was entered into between Sircy and Glas Brothers to construct the second story at a cost of $1,318. He further testified: "With most of the alterations I consulted Mr. Madary, but not all of them. Several minor things, possibly, I did not say anything about for some little time. He was my adviser, and I did not do anything without advising with him. When I say advised with Mr. Madary, I meant to say that the changes would be made and then I advised with Mr. Madary when I came to town. I would tell him what I did, simply advised with him. I mean that these improvements or alterations, that Mr. Madary either knew of before they were started, or if they were started, and there were some that he didn't know anything about them until they were actually finished."

Madary testified: "With reference to these alterations I knew very little about them. Mr. Sircy would bring me an agreement once in a while, showing that there had been a change made and that he and the Glas boys had signed. I never gave my consent, or any authority to make any changes to anyone."

What Madary's business relation was to the Glas Brothers or to the construction of the building does not clearly appear. He seems to have had something to do with paying out the money for the work. But that he had any supervisory authority over the work or of agreements relating to it does not appear. Sircy advised with him, but whether it was to obtain his consent to things done is not shown. On the contrary, Sircy testified that he either knew of improvements

or alterations before they were made, or was told of them after "they were actually finished." Madary testified that he "knew very little about them," and he "never gave his consent, or any authority to make any changes to anyone." It does not appear that Madary had even knowledge of all the changes made before the work was completed. Sircy testified that there were improvements and alterations that Madary knew nothing about "until they were actually finished," and he nowhere testifies that Madary ever consented to them. We do not think that any such relation of Madary to the work is shown as would justify the inference that knowledge of all the alterations, if he had it, which is not proven, was equivalent to consent. The burden was upon defendants to prove his consent—something more than knowledge—and we do not think they successfully sustained such burden.

There remains one other view of the case to be disposed of. The contract expressly provided that "should the owners or the architects, at any time, during the progress of the work, request any alteration to, or omission from this contract or the plans or specifications or either of them, shall be at liberty to do so, and the same shall in no way affect or make void this contract; but the amount thereof shall be added to, or deducted from the amount of the contract price aforesaid, as the case may be, by a fair and reasonable valuation. And this contract shall be held to be completed, when the work is completed in accordance with the original plans, as amended by such changes, whatever the nature or extent thereof."

The bond was attached to and referred only to the contract of November 9, 1903. It seems to us that the alterations in the plans and specifications or changes to be made had reference to changes in the one-story building which was to be built; that changes and alterations in the construction of that building should not invalidate the contract, but that the "contract shall be held to be completed when the work is finished in accordance with the original plans, as amended by such changes, whatever the nature or extent"; that is, the work on the building contemplated by the contract. It would be unreasonable to hold that the effect of the bond was to guarantee the work done in the construction of a two-story building, for if we should take that view it would follow that the owners might have converted the plans into a six-story building and increased the cost four or five fold. The change to a two-story building was not decided upon until the one-story building was well toward completion, and the memorandum was

not signed until December 24, 1903. By its terms the owners were to pay $1,311.18 in addition to all charges made for other changes, which latter amounted to $490.22. It is uncontradicted that the owners authorized the expenditure for and have had the benefit of the labor and materials involved in this lien. We see no reason why they should escape liability or that the building should not be subjected to the lien.

The judgment as to both causes of action is reversed.

Burnett, J., and Hart, J., concurred.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on February 1, 1909.